Shugart, Admr. *v.* Metropolitan Life Ins. Company,
Appellant.

Argued September 26, 1934.

Before KELLER, CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER and JAMES, JJ.

*Arthur G. Dickson,* and with him *Leroy A. Lincoln,*
for appellant.

*Daniel Marcu,* and with him *Joseph Jaffe,* for ap-
pellee.

Opinion by Cunningham, J., February 1, 1935:

Plaintiff's intestate, Lottie Shugart, was the insured in three industrial life insurance policies, issued from time to time by the defendant below and appellant herein, Metropolitan Life Insurance Company, and payable to her estate. The total amount of the policies was $636 and to each was attached an Accidental Death Benefit rider providing, insofar as this case is concerned, for the payment of additional death benefits, equal to the face amount of the policies: "Upon receipt of due proof that the insured . . . . . . has sustained . . . . . . bodily injuries, solely through external, violent and accidental means, resulting, directly and independently of all other causes, in the death of the insured, . . . . . . No accidental death benefit will be paid . . . . . . if death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity."

Upon the sudden death of the insured on April 15, 1933, appellant paid the face amount of the policies. Averring that the insured's death resulted, directly and independently of all other causes, from head injuries sustained through external, violent and accidental means, i. e. by falling from the top to the bottom of a flight of four steps at the front door of her residence, plaintiff brought this action to recover the additional sum of $636, under the provisions of the riders. The only defense interposed was that the death of the insured "was contributed to by disease," and was not caused "solely through external, violent and accidental means." The trial resulted in a verdict in favor of plaintiff for $655.08—the amount of the accidental death benefits provided for in the riders, with interest thereon. Appellant's motions for a new trial and for judgment n. o. v. were denied, and it now appeals from the judgment entered upon the verdict.

The assignments raise the single question whether

it was error to refuse appellant's point for binding instructions and deny its subsequent motion for judgment n. o. v. As the issues involved at the trial were solely of fact, our inquiry is whether there was sufficient competent evidence upon which, if believed, a jury could reasonably make a finding in favor of the plaintiff.

The principles of law, relative to the extent of the burden resting upon the plaintiff in a case of this kind and the character of proof required, were considered by this court in the recent case of Lubowicki v. Metropolitan Life Ins. Co., 114 Pa. Superior Ct. 596, 174 A. 649, and need not be repeated. The provisions of the rider there involved were identical with those here present, but the trial judge affirmed the defendant's point for binding instructions and we agreed with the court below in holding that the plaintiff in that case had not submitted sufficient evidence to entitle her to go to the jury.

When the evidence in this case is read in the light most favorable to the plaintiff, as it must be, it is apparent that a number of material facts are not in controversy. That the insured died within three hours after falling down the front steps of her residence and striking the back of her head upon the lower step with sufficient force to split the tread lengthwise, or that the immediate cause of her death was an epidural hemorrhage from the meningeal artery, causing approximately six ounces of blood to gather between the skull and the brain covering, is not disputed.

Nor is it questioned that she had been suffering for a considerable period of time with a chronic and progressive disease of the bones—known as Paget's disease or osteitis deformans—in which the percentage of lime in the bones becomes abnormally low, resulting in their enlargement and softening. As disclosed by an autopsy, the insured's skull was at least twice as

thick as that of a normal person and somewhat softened; the bones of her extremities were also affected and her legs and arms somewhat bowed. There was uncontradicted evidence that, notwithstanding these conditions, she had been living a normal life and doing all her housework; on the afternoon of the fall she had visited her daughter in a distant part of the city (unaccompanied and traveling by trolley) and had engaged in active play with her grandchildren. There was evidence that Paget's disease does not shorten life. When present, some weakness and stiffness usually exists ''but death occurs only from intercurrent disease, usually pulmonary, or from advanced arteriosclerosis, which is a prominent feature of the malady.'' The physicians who conducted the autopsy testified they found no indication of pulmonary lesions or of arteriosclerosis.

Another abnormality disclosed by the post-mortem was that the insured congenitally had but one kidney, but the medical witnesses called in behalf of plaintiff testified her health had not been impaired by this circumstance. Not only was the contention made in behalf of appellant that the insured's bodily infirmity contributed generally to her death, but it was also specifically contended that her fall was not purely accidental but was caused by the diseased condition of the bones of her legs. The fact of the fall was not disputed but its cause was in controversy.

While the insured was at the residence of her daughter, during the afternoon of the day she was injured, an effort was made to deliver a package at her home. As the house was locked the package was left with her next door neighbor. Shortly after the return of the insured, a son of her neighbor brought the package to her. She was standing on the broad step leading to her front door with her arms extended to receive it from him as he stood on the pavement about four feet

below her. His description of the occurrence reads: "A. ...... As she went to receive the package, it seemed that her left foot tripped and she fell over towards her right and I dropped the package and made to grab her, and caught her about the waist line and it seems her left foot tripped. Q. What do you mean, tripped over what? A. Over her right foot, just seemed to hit the foot and she went over towards the right. Q. How did she land, strike anything? A. Yes, she struck the step as I caught her by the waist line. Q. Which step? A. The bottom step. Q. Did she land face up or face down? A. Face up. Q. On her back? A. On her back. Q. Did you assist her up to her feet? A. Yes, with her husband, she was complaining to her husband about her head. Q. What did she say? A. 'Oh, Charlie my head, my head.' Q. Did she get up on her feet then? A. Yes, and we assisted her in the house."

A physician, Dr. Glauser, was called immediately and, finding that insured was unconscious and suffering from shock, had her removed to a hospital where she died within a few minutes after admission.

Dr. Gershon Ginsburg, who conducted the post-mortem along with Dr. Glauser, was also called as a witness for plaintiff. Upon the vital question in this case Dr. Glauser testified that the hemorrhage which caused insured's death was "not a case of hemorrhage from Paget's disease," and that he could see no connection between the fall and death and the disease with which the insured was afflicted. An excerpt from Dr. Ginsburg's testimony reads: "Q. Having heard all those things, [the prior testimony] doctor, would you say Paget's disease had any effect on the death of this woman? A. No, sir. Q. What would you say caused her death? A. Her death was due to the pressure of the blood on the brain. Q. Caused by what? A. By pressure on the brain due to a hemorrhage. Q. What would you say caused that doctor? A. The fall, evi-

dently, according to the history.'' In our opinion, the evidence to which we have referred was sufficient, if accepted by the jury, to meet the burden imposed upon the plaintiff.

The opinions expressed by the medical experts through whom the plaintiff spoke were combated to some extent by Dr. Thomas A. Shallow, called by appellant. His only knowledge of the case was gained by listening to the testimony for the plaintiff. As we read his testimony, his conclusions were that the disease from which the insured was suffering ''could'' have contributed to her fall and death because the bones of one thus afflicted ''do not have the actual resistance to force that you have in a normal individual,'' and because arteriosclerosis (affecting, as it does, the elasticity of the arteries) is a condition which, in his opinion, is present in Paget's disease at the stage to which plaintiff's experts said it had advanced. The other testimony in behalf of appellant had no material bearing upon the controlling questions.

The issue raised by the medical testimony was submitted to the jury in a charge concerning which no complaint is made and appellant seems to have been given the full benefit of its expert evidence by the affirmance of its second point, reading: ''2. If you shall find from the evidence that disease or bodily infirmity contributed in any way to insured's death, as, for example, by making her more readily fall as the result of tripping or giddiness, or by making a blow that did not fracture the skull, or even break the skin, have a fatal result, because the arteries were not protected by normal bone structure, or were hardened and fragile, then your verdict should be rendered for the defendant.''

We think the case was clearly for the jury; it was within its province to decide which theory it would accept. Upon a careful examination of the evidence,

we are convinced that the trial judge did not err in refusing appellant's point for binding instructions, and that the court below was justified, upon the whole record, in denying its motion for judgment in its favor, notwithstanding the verdict.

Judgment affirmed.